# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| ANDRITZ SUNDWIG GMBH, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:18-2061 |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

This case is before the Court on the Complaint and Application for Temporary Restraining Order, Temporary Injunction and Permanent Injunction [Doc. # 1], and Brief Regarding Standard of Review in Support of Temporary Restraining Order ("TRO") [Doc. # 7] filed by Plaintiff Andritz Sundwig, GmbH ("Andritz"). The United States filed an Opposition [Doc. # 8], and Andritz filed a Reply [Doc. # 11].

Also pending is the Motion to Modify Court's Status Quo Order [Doc. # 9]. The United States has filed a Response [Doc. # 12], and Andritz filed a Reply [Doc. # 19].

The Court has carefully reviewed the parties' briefing, and conducted an evidentiary hearing on Andritz's request for injunctive relief. Based on its review of the full record and the applicable legal authorities, the Court **denies** both of Plaintiff's motions.

# I.   BACKGROUND

Andritz is a German company.  Andritz sold two cold rolling steel mills (the "Cargo") to Nucor Corporation ("Nucor") for installation in its facility in Arkansas. The Cargo was packaged in 439 crates of widely varying shapes and sizes that were subject to two separate Bills of Lading, one ending in H01 (the "H01 Crates") and the other ending in H02 (the "H02 Crates").  The Cargo was shipped from Germany to Houston on board the vessel M/V Nordic Svalbard.  Portions of the crates were constructed of solid wood, rather than manufactured wood (such as plywood) or particle board.  The tops of the crates were covered with water impermeable plastic.

The Cargo arrived at the Port of Houston on Friday, June 8, 2018.  Much of the Cargo was unloaded at the Manchester Terminal and scattered throughout the property.  The following afternoon, June 9, 2018, United States Customs and Border Protection ("CBP") Inspector John Lopez saw Cargo that was packaged in solid wood that was marked with a "heat treatment" stamp.  Lopez was concerned because, based on his training and experience, he knew that heat treatment can be ineffective for certain pests.

Lopez chiseled into one of the pieces of wood packaging material ("WPM") for the H01 Crates, and he found live insect larvae inside.  Based on his training and experience, he believed that the insects were siricidae, or wood wasps.  He removed two of the insects, placed them into a container, sealed the container, and sent it to the

CBP Houston Laboratory at the George Bush Intercontinental Airport for identification.

Having found insects that he believed to be siricidae in the H01 Crates, Lopez examined the H02 Crates. The H02 Crates also contained live insects. Lopez removed one from a piece of WPM of the H02 Crates, but he could not determine whether it was a siricidae. Lopez sealed this insect in a vial and sent it to the CBP Houston Laboratory for identification.

Brian Petty, a CBP Houston Laboratory Identifier, received the samples the next day, June 10, 2018. He confirmed that the insects in the H01 Crates were siricidae. The insect from the H02 Crates was not.

Based on the presence on June 9, 2018, of what he correctly believed to be siricidae in the H01 Crates, in the early morning on June 10, Lopez issued Emergency Action Notices ("EAN") for safeguarding the entire Cargo and packaging.[1] This and the other EANs in this case were issued on behalf of the the United States Department of Agriculture ("USDA"), Animal Plant Health Inspection Service ("APHIS"), Plant Protection and Quarantine ("PPQ"). *See, e.g.*, EAN, Administrative Record ("AR"),

---

[1]    Lopez also issued a Notice to Redeliver, requiring Nucor to redeliver to CBP any cargo or WPM that had left the Port of Houston before Lopez discovered the siricidae in the H01 Crates. *See* Notice to Mark and/or Notice to Redeliver, Administrative Record ("AR"), 012. The H01 Crates and the H02 Crates, however, were still at the Port of Houston.

001. Each EAN notified the shipper that the "cargo and [WPM] must be tarped immediately by a USDA compliant firm as a safeguarding measure to prevent the spread of live pests." *See* EAN Serial No. 96029 (AR-001); EAN Serial No. 96030 (AR-002). Lopez did not perform any analysis regarding the availability or feasibility of less drastic alternatives but, at this point, the only action required was for the shipper to tarp the Cargo as a safeguarding measure.[2]

On June 11, 2018, after the insects were confirmed to be siricidae, CBP issued an EAN requiring the re-exportation within seven days of the WPM in the H01 Crates. *See* EAN Serial No. 96081 (AR-003). The EAN provided that the "cargo and wood packing imported under bill of lading [H01] has been refused entry and must be exported immediately from the Port of Houston." *Id.* The EAN required that the Cargo and shipping material must be "loaded in a sealed hold and cannot be opened while in US waters/ports." *Id.* The EAN provided that the Cargo could not be "loaded or moved until all conditions" of the EAN have been satisfied and approved

---

[2]     The EANs dated June 10, 2018, include language that the "shipment must be re-exported or destroyed. Please discuss options with an Agriculture Officer." *See, e.g.*, EAN Serial No. 96029. Lopez explained during his hearing testimony that these two sentences are boilerplate in the computer and cannot be skipped or removed. He noted that he did not mark the "Re-Exportation" box on the EANs, and that he added the key individualized language that the cargo and WPM must be "tarped immediately by a USDA compliant firm as a safeguarding measure to prevent the spread of live pests." Lopez testified that he also added the language in the EANs that the shipment "has been placed on hold with U.S. Customs and Border Protection . . .."

by CBP. *Id.* This EAN again required that the Cargo be tarped and quarantined as required by the prior EAN, Serial No. 96029, and provided that only the USDA compliant fumigator could enter the safeguarding area. *Id.*

On June 13, 2018, CBP Agriculture Specialist Howard Adams inspected the Cargo. At that time, the Cargo was located in multiple places in the Manchester Terminal. Adams looked for infestation and found exit holes and excrement from insects in the WPM of the H02 Crates. Adams also examined the WPM on the bottom of a crate set on a pallet, and found live insects and larvae in the solid wood. He placed the live insects into a vial, and submitted them to CBP's Houston Laboratory for inspection. These insects from the H02 Crates were later identified as siricidae.

Adams also observed that some of the tarping of the Cargo was not compliant with the earlier EANs; those tarps did not cover the Cargo completely and/or were not secured at the bottom. Adams issued a second EAN for the H02 Crates, again requiring that the H02 Crates be properly tarped as a safeguarding measure. *See* EAN Serial No. 96733 (AR-005).

On June 14, 2018, CBP issued a new EAN for the H02 Crates. *See* EAN Serial No. 96842 (AR-006). The EAN contained the same requirements for the H02 Crates as EAN Serial No. 96081 contained for the H01 Crates.

On June 15, 2018, Andritz filed a Protest challenging the EANs and requesting permission to separate the Cargo from the infested WPM. *See* Protest, Exh. 2 to Complaint [Doc. # 1]. CBP, through the Assistant Port Director, responded that, after consultation with the USDA, it was determined that separation presented a pest risk. *See* Communication from Assistant Port Director to Andritz, Exh. 1 to Complaint.

On June 17, 2018, Andritz filed a Complaint and Application for Temporary Restraining Order, Temporary Injunction and Permanent Injunction in the United States Court of International Trade. In that case, Andritz challenged the EANs issued on and before June 13, 2018. The case in the Court of International Trade was later transferred to the Southern District of Texas.

On June 18, 2018, CBP issued new EANs for the crates under both bills of lading. *See* EAN Serial No. 97291 (AR-008) (for H02 Crates); EAN Serial No. 97296 (AR-009) (for H01 Crates). These EANs required that all Cargo and WPM "be immediately loaded inside the sealed vessel hold(s) of the Nordic Svalbard to prevent further spread of the pests." *Id.* The shipper was required to continue safeguarding the Cargo until given further direction by CBP's Agriculture Specialists.

On June 20, 2018, CBP issued EANs Serial No. 97819 (AR-010) (for the H01 Crates) and Serial No. 97820 (AR-011) (for the H02 Crates) requiring immediate exportation of the Cargo from the Port of Houston (the "Re-Exportation Order"). The

EANs required that the Cargo be loaded in a sealed hold and not opened while in US waters or ports.

That same day, Andritz filed a separate Complaint and Application for Temporary Restraining Order, Temporary Injunction and Permanent Injunction in this federal district. In an *ex parte* Order entered at 10:33 p.m. on June 20, 2018, United States Magistrate Judge Dena Palermo scheduled a conference on the Application for Temporary Restraining Order for June 21, 2018, at 10:30 a.m. before the undersigned. *See* Order [Doc. # 3]. Magistrate Judge Palermo ordered that "the status quo regarding the vessel and cargo must be maintained." *See id.*, ¶ 3.

At the conference on June 21, 2018, this Court scheduled a status conference for June 22, 2018, and ordered that the "status quo remains in effect until a ruling is made on the TRO motion." *See* Hearing Minutes and Order [Doc. # 4]. The next day, on June 22, 2018, at a second conference, the Court scheduled an evidentiary hearing for June 25, 2018. *See* Hearing Minutes and Order [Doc. # 5].

The parties and the Court agreed that the June 25, 2018, hearing would be a preliminary injunction hearing. The Court asked the United States to present its evidence first in order to introduce and explain the administrative record. The United States presented testimony from Customs Inspector Lopez and CBP Agriculture Specialist Adams. Their testimony is set forth in relevant part above.

The United States also presented at the hearing live testimony from Dr. John Daniels, the Department of Agriculture Officer in Charge of Plant Protection and Quarantine in Houston. Dr. Daniels's testimony is set forth below in Section III.A. regarding Andritz's likelihood of success on the merits of its challenge to the agency decision to issue the EANs and the Re-Exportation Order.

Andritz also presented testimony at the hearing. Andritz presented, via telephone, testimony of its President, Guido Andree Burgel, and live testimony of Keith Williams, a corporate representative of Nucor. These two witnesses testified primarily on the issue of irreparable harm, discussed more fully in Section III.B. below.

Andritz also presented the testimony of Eugene Albert Hall, Jr. and David Wayne Cottrell regarding ideas for dealing with the WPM infestation problem. Hall, a representative of International Fumigators Inc., testified that the Cargo could be fumigated in the ship's hold.[3] Hall testified that bromide gas could be introduced through the "man-ways," after which the crew would seal the area and leave the ship. He testified further, however, that his ideas are not a full fumigation plan, for which he would need to develop more details and to confer with the USDA. He also testified that he would need to see the Cargo before finalizing a fumigation plan, as he does not

---

[3]     The Cargo is currently in a sealed area of the ship's hold.

currently know what is inside all the crates or what they are wrapped with. He further testified that he would need to breach the USDA seals that are currently in place.

Cottrell is a representative of Deugro USA, Inc., the project forwarder for Andritz's Cargo shipment. Cottrell testified that after the WPM has been fumigated, the current WPM could be removed and the Cargo could be repackaged in pest-free WPM. He testified that this could be accomplished within approximately 48 days after fumigation is complete if done in the United States in or near the Port of Houston, but it would take longer if done elsewhere. He stated it would be easier if the work could be done in an unused packing facility in the area, but he had taken no steps to determine if such a plan could be implemented in fact. He testified that it would be difficult to ship the Cargo in its current condition to any other country, because it is unlikely that another country would allow entry of the siricidae-infested WPM.

Each side presented the testimony of at least one entomology expert.[4] Andritz presented the testimony of Jeffrey Tucker, who holds a B.S. degree from Texas A&M

_____

[4]     Andritz argues that the USDA failed to present evidence that satisfies the test for admissibility of scientific expert testimony set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The Court declines to apply the *Daubert* analysis in connection with its review under the Administrative Procedure Act of an agency decision because "forcing an agency to make such a showing as a general rule is intrusive, undeferential, and not required." *See Sierra Club v. Marita*, 46 F.3d 606, 622 (7th Cir. 1995); *see also Stewart v. Potts*, 996 F. Supp. 668, 678 n.8 (S.D. Tex. 1998); *cf. Libas, Ltd. v. United States*, 193 F.3d 1361, 1365-66 (Fed. Cir. 1999).

University.[5]  Tucker agreed that the siricidae species sirex noctilio is a serious pest, causing an 80%+ mortality rate in the pine trees it attacks.  Tucker testified that he believed fumigation could be performed in a ship's hold.  He approved of the plan suggested by Hall, but agreed with Hall that it would be important to see the hold where the Cargo is located.  He conceded also that he is not sure that Hall's plan would be 100% effective.  Tucker also testified that at least a portion of the Manchester Terminal would need to be shut down for a number of hours to complete the fumigation under Hall's plan.  He was uncertain if the necessary time would be a day, or more, or less.

Tucker had no concern about the USDA identifying pests in the importation context at the "family" level rather than at the individual "species" level.  He agreed with the Government witnesses that Texas has a large lumber industry that is worth protecting.

The United States presented testimony from Dr. Eugenio Nearns, an entomologist at the Smithsonian Institute who works with the USDA.  Nearns holds a Ph.D. in Entomology from the University of New Mexico.  He stated his belief that at least one of the samples taken from the WPM in which Andritz's Cargo was packaged was sirex noctilio, or hymenoptera siricidae.  He testified further that the

---

[5]     Tucker testified that he entered the Ph.D. program at the University of Illinois, but did not complete the program.

samples included siricidae at different stages of the life cycle, increasing the likelihood that there are currently adult siricidae flying in the sealed hold, given that two weeks had passed since the samples had been taken and the temperatures in the hold were very high.

At the conclusion of the evidentiary hearing, Andritz presented a "Bench Brief on 7 U.S.C. § 7714," but counsel has not filed that brief on the docket. Since the completion of the hearing, the parties have submitted supplemental briefing. *See* United States Response to Plaintiff's Bench Brief [Doc. # 27]; Plaintiff's Supplementary Brief on Administrative Law Issues [Doc. # 28]; Plaintiff's Supplemental Brief in Support of Application for Temporary Restraining Order [Doc. # 32]. Additionally, the United States has submitted the Declaration of Matthew Farmer [Doc. # 30], to which the "Houston WPM Siricidae Interceptions Molecular Analysis Report" is attached as Exhibit 1, and Andritz filed a Brief in Response to Farmer Declaration [Doc. # 31], with attached exhibits. At this point, the pending Motions have been exhaustively briefed and the parties have presented evidence to assist the Court in applying the applicable legal standards. As a result, the pending Motions are now ripe for decision.

## II.    APPLICABLE LEGAL STANDARDS

### A.    Standard for Preliminary Injunction

To be entitled to a preliminary injunction, Plaintiff must show (1) a substantial likelihood that it will prevail on the merits, (2) a substantial threat that it will suffer irreparable injury if the injunction is not granted, (3) its threatened injury outweighs the threatened harm to the party to be enjoined, and (4) granting the preliminary injunction will not disserve the public interest. *See City of El Cenizo, Texas v. Texas*, 890 F.3d 164, 176 (5th Cir. 2018); *Bluefield Water Ass'n, Inc. v. City of Starkville, Miss.*, 577 F.3d 250, 252-53 (5th Cir. 2009). The burden of proof on all four factors is always on Plaintiff. *See Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985) (citing *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974)).

In determining whether to grant preliminary relief, the Court "must remember that a preliminary injunction is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion." *Canal*, 489 F.2d at 573; *see also Benisek v. Lamone*, __ U.S. __, 138 S. Ct. 1942, 1943 (2018) ("a preliminary injunction is 'an extraordinary remedy never awarded as of right'"). A district court's decision to deny a preliminary injunction is reviewed for an abuse of discretion. *See Moore v. Brown*, 868 F.3d 398, 402 (5th Cir. 2017).

## B.    Standard for Review of an Agency Decision

A court reviewing an agency decision under the Administrative Procedure Act ("APA") is authorized to set aside agency action that is:

> (A)    arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or]
>
> *    *    *    *
>
> (F)    unwarranted by the facts *to the extent that* the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706(2)(A), (F) (emphasis added).  Plaintiff argues that the Court should review CBP's decision *de novo* pursuant to § 706(2)(F), because the decision to re-export the Cargo is adjudicatory in nature, citing *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971).

In 1971, the United States Supreme Court restricted *de novo* review of an agency's decision to two limited situations: (1) "when the action is adjudicatory in nature and the agency factfinding procedures are inadequate" and (2) when "issues that were not before the agency are raised in a proceeding to enforce nonadjudicatory agency action."  *See Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated by Califano v. Sanders*, 430 U.S. 99 (1977).[6]  Since the Supreme

---

[6]    In *Overton*, federal statutes prohibited the Secretary of Transportation from authorizing the use of federal funds to finance the construction of highways through public parks if there was a "feasible and prudent" alternative route.  If no such alternative route were available, the statutes allowed the Secretary to approve

(continued...)

Court issued its 1971 decision in *Overton*, "*de novo* review of agency adjudications has virtually ceased to exist.  In its stead, the 'arbitrary and capricious' standard of review of 5 U.S.C. § 706(2)(A) is now applied to review of agency determinations in the adjudicatory setting."  *Sierra Club v. Peterson*, 185 F.3d 349, 368 (5th Cir. 1999), *on reh'g en banc*, 228 F.3d 559 (5th Cir. 2000)[7]; *Safety Nat. Cas. Corp. v. U.S. Dep't of Homeland Sec.*, 711 F. Supp. 2d 697, 707 (S.D. Tex. 2008) (Ellison, J.).  "*De novo* review is only available 'in special circumstances where [an] agency does not possess adequate factfinding procedure, not just that it failed to employ adequate procedures.'"  *Id.* (quoting 33 Charles Alan Wright and Charles H. Koch, Jr., FEDERAL PRACTICE AND PROCEDURE § 8332).  Therefore, the Court applies the arbitrary and capricious standard of review in this case.

An agency's decision is arbitrary and capricious if:

---

[6]     (...continued)
construction through parks only if there has been "all possible planning to minimize harm" to the park.  *See Overton*, 401 U.S. at 405.  Citizens groups and other sued to enjoin the Secretary from releasing federal funds to construct an expressway, part of which passed through a city park.  *See id.* at 406.  The Supreme Court held that the Secretary's decision that there was no "feasible and prudent" alternative route and that there had been "all possible planning to minimize harm" to the park was not subject to *de novo* review and, instead, was governed by § 706(2)(A)'s "arbitrary and capricious" standard.  *See id.* at 415-16.

[7]     In *Peterson*, the district court issued an injunction and a panel of the Fifth Circuit originally affirmed.  *See Peterson*, 185 F.3d at 375.  On rehearing, the *en banc* Fifth Circuit held that there was no final agency action and, therefore, vacated the district court's injunction and remanded for further proceedings.  *See Sierra Club v. Peterson*, 228 F.3d at 570.

the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Baylor Cty. Hosp. Dist. v. Price*, 850 F.3d 257, 264 (5th Cir. 2017) (citing *Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 933 (5th Cir. 1998) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983))). The agency decision "is entitled to a presumption of regularity." *Overton*, 401 U.S. at 415. An agency's decision is not arbitrary and capricious if the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Balt. Gas and Elec. Co. v. Nat'l Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983). "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts . . .." *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989). "So long as the agency's reasons and policy choices conform to minimal standards of rationality, then its actions are reasonable and must be upheld." *Price*, 850 F.3d at 264. The Court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007).

To determine whether an agency's decision was arbitrary and capricious, the Court considers the administrative record. The administrative record includes all documents and materials considered by agency decision-makers, directly or indirectly. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487-88 (1951); *Exxon Corp. v. Dep't of Energy*, 91 F.R.D. 26, 33 (N.D. Tex. 1981).

Supplementation of the administrative record is permissible when the Court would benefit from "background information" in order to determine whether the agency considered all of the relevant factors. *See Medina Cty. Envtl. Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 706 (5th Cir. 2010); *Nat'l Fed'n of Indep. Bus. v. Perez*, 2016 WL 3766121, *24 (N.D. Tex. June 27, 2016). The Court may receive testimony from the administrative officials who participated in the decision explaining their action. *See Overton*, 401 U.S. at 420. As a general rule, if "an agency decision is not sustainable on the basis of the administrative record, then the matter should be remanded to [the agency] for further consideration." *O'Reilly v. U.S. Army Corps of Engineers*, 477 F.3d 225, 238 (5th Cir. 2007) (internal quotations and citations omitted).

## III.  ANALYSIS

### A.  Likelihood of Success on the Merits

Andritz argues that the EANs are invalid, and seeks declaratory and injunctive relief to prevent enforcement of the Re-Exportation Order.  As noted, the agency decision is entitled to a presumption of regularity, and Andritz bears the burden to prove that the decision to issue the EANs was arbitrary and capricious.  To obtain a preliminary injunction, Andritz bears the burden to demonstrate that it is likely to succeed in satisfying the highly deferential arbitrary and capricious standard.

The Plant Protection Act ("PPA") was enacted based on Congressional findings.  *See* 7 U.S.C. § 7701.  Andritz focuses on the fifth finding, that "the smooth movement of *enterable* plants, plant products, biological control organisms, or other articles into, out of, or within the United States is vital to the United States economy and should be facilitated to the extent possible."  7 U.S.C. § 7701(5) (emphasis added).  Andritz's reliance on this finding is unpersuasive because articles infested with non-native siricidae are not "enterable" into the United States.  *See* 7 U.S.C. § 7712(a).  Additionally, the Congressional finding relied upon by Andritz is one of nine, with none given more importance by Congress than any other.[8]

---

[8]      The Congressional findings for purposes of enacting the PPA are:

(1)      the detection, control, eradication, suppression, prevention, or retardation of
(continued...)

(...continued)
the spread of plant pests or noxious weeds is necessary for the protection of the agriculture, environment, and economy of the United States;

(2)    biological control is often a desirable, low-risk means of ridding crops and other plants of plant pests and noxious weeds, and its use should be facilitated by the Department of Agriculture, other Federal agencies, and States whenever feasible;

(3)    it is the responsibility of the Secretary to facilitate exports, imports, and interstate commerce in agricultural products and other commodities that pose a risk of harboring plant pests or noxious weeds in ways that will reduce, to the extent practicable, as determined by the Secretary, the risk of dissemination of plant pests or noxious weeds;

(4)    decisions affecting imports, exports, and interstate movement of products regulated under this chapter shall be based on sound science;

(5)    the smooth movement of enterable plants, plant products, biological control organisms, or other articles into, out of, or within the United States is vital to the United States economy and should be facilitated to the extent possible;

(6)    export markets could be severely impacted by the introduction or spread of plant pests or noxious weeds into or within the United States;

(7)    the unregulated movement of plant pests, noxious weeds, plants, certain biological control organisms, plant products, and articles capable of harboring plant pests or noxious weeds could present an unacceptable risk of introducing or spreading plant pests or noxious weeds;

(8)    the existence on any premises in the United States of a plant pest or noxious weed new to or not known to be widely prevalent in or distributed within and throughout the United States could constitute a threat to crops and other plants or plant products of the United States and burden interstate commerce or foreign commerce; and

(9)    all plant pests, noxious weeds, plants, plant products, articles capable of harboring plant pests or noxious weeds regulated under this chapter are in or affect interstate commerce or foreign commerce.

(continued...)

The PPA authorizes the Secretary of the United States Department of Agriculture to "prohibit or restrict the importation, entry, exportation, or movement in interstate commerce" of any plant pest or means of conveyance, "if the Secretary determines that the prohibition or restriction is necessary to prevent the introduction into the United States or the dissemination of a plant pest or noxious weed within the United States." 7 U.S.C. § 7712(a). When a plant pest arrives at a port of entry into the United States, the Secretary is notified. *See* 7 U.S.C. § 7713(a)(1). Thereafter, the shipment is held at the port of entry until it is (a) inspected and authorized for entry into or transit movement through the United States; or (b) otherwise released by the Secretary of Agriculture. *See* 7 U.S.C. § 7713(a)(2). When inspection of a means of conveyance arriving into the United States reveals a plant pest, "or provides a reason to believe such a pest is present," which pest is "new to, or not theretofore known to be widely prevalent or distributed within and throughout the United States, the inspector shall employ procedures necessary to prevent the dissemination of the plant pest." 7 C.F.R. § 330.106.

The PPA provides that the Secretary has the discretion to hold or destroy items if "the Secretary considers it necessary in order to prevent the dissemination of a plant pest or noxious weed that is new to or not known to be widely prevalent or distributed

[8]    (...continued)
       7 U.S.C. § 7701.

within and throughout the United States . . ..” 7 U.S.C. § 7714(a).[9] Andritz argues

that the issuance of the EANs was arbitrary and capricious because the PPA does not

apply in this case. In support of this argument, Andritz presented evidence that certain

species of siricidae have been found in New York and Pennsylvania, but not in Texas

or anywhere south of North Carolina. The statutory authorization in the PPA,

however, is not limited to pests that are entirely new to the United States. Instead, the

PPA applies where, as here, the pest is “not known to be widely prevalent or

distributed within *and throughout* the United States.” *See id.* (emphasis added).

Evidence that siricidae similar to those found in the WPM in this case have infested

pine forests in Pennsylvania and New York (and apparently is starting to spread to

other states) does not show that the siricidae in the WPM is known to be widely

prevalent or distributed throughout the United States. Andritz’s argument regarding

the applicability of the PPA is refuted by the clear and unambiguous language of the

---

[9]        Regulated wood packaging material may be imported into the United States without
a special permit if, among other requirements, it is properly marked. *See* 7 C.F.R.
§ 319.40-3(b)(2). WPM that is not properly marked is subject to immediate export.
See 7 C.F.R. § 319.40-3(b)(3). The re-export provision of the regulation states
specifically that it is in addition to other first arrival procedures required by 7 C.F.R.
§ 319.40-9. *See id.* One of the arrival procedures required by § 319.40-9 is that
WPM that is so infested with a plant pest that, in the judgment of the inspector, the
regulated article cannot be cleaned or treated, “the entire lot may be refused entry into
the United States.” *See* 7 U.S.C. § 319.40-9(a)(3). The presence of a “heat treatment”
mark on pest infested WPM does not preclude its re-exportation.

statute, and it does not demonstrate that the agency decisions in this case were arbitrary and capricious.

Andritz argues also that the decision to issue the EANs was arbitrary and capricious because the agency failed to identify the siricidae in the WPM to the individual species level, rather than to the genus, or family, level. Andritz provides no legal authority that supports imposing this requirement under the PPA.[10] Moreover, Congress has not specified the level at which a pest must be identified for purposes of the PPA, and the Secretary's choice to identify at the family level "conforms to minimal standards of rationality." *See, e.g., Baylor Cnty. Hosp. Dist. v. Price*, 850 F.3d 257, 265 (5th Cir. 2017) (classifying roads as primary or secondary). Therefore, Andritz has not shown a viable legal basis to challenge the agency's failure to identify the siricidae in the WPM at the individual species level before taking action.[11]

---

[10] Andritz's expert, Jeffrey Tucker, expressed no concern or "quibble" with the USDA's practice to identify pests only to the family level.

[11] After the preliminary injunction hearing was completed, and not part of the Administrative Record on which CBP based its decision to issue the EANs and the Re-Exportation Order, the USDA received the results of DNA testing designed to identify the insects to the individual species level. The test results revealed that at least one of the samples was the sirex species. *See* Houston WPM Siricidae Interceptions Molecular Analysis Report ("Molecular Analysis Report"), Exh. 1 to Declaration of Matthew Farmer [Doc. # 30]. The molecular analysis of the insects from the WPM did not match the identification sample of any of the 14 New World sirex species. *See id.* The molecular analysis revealed also that none of the siricidae found in the WPM in this case were native to the United States and, indeed, were most likely not a species native to or previously seen in North America. *See id.*

(continued...)

Andritz argues also that the EANs are invalid because the agency failed to comply with § 7714(d)'s requirement that less drastic action be considered. As a limitation on the Secretary's authority, the PPA provides that no plant pest or means of conveyance shall be

> destroyed, exported, or returned to the shipping point of origin, or ordered to be destroyed, exported, or returned to the shipping point of origin under this section unless, *in the opinion of the Secretary*, there is no less drastic action that is feasible and that would be adequate to prevent the dissemination of any plant pest or noxious weed new to or not known to be widely prevalent or distributed within and throughout the United States.

7 U.S.C. § 7714(d) (emphasis added). "Congress has provided that the application of these constraints in any particular instance is substantially committed to the judgment of the Secretary." *Intercitrus, Ibertrade Commercial Corp. v. United States Dept. of Agric.*, 2002 WL 1870467, *5 (E.D. Pa. Aug. 13, 2002). Andritz must show that the Secretary did not take the least drastic action that would be both feasible and "adequate to prevent dissemination of a plant pest . . . not known to be widely

---

[11]      (...continued)
In its Brief in Response to Farmer Declaration [Doc. # 31], Andritz notes that the insects from the WPM were a 97% match to a silex juvencus sample. As explained in the Molecular Analysis Report, however, there are two identification samples in the Genbank system that are both identified as silex juvencus but, with only 89% similarity between the two samples, they are clearly not the same insect. *See* Molecular Analysis Report, p. 2. When the insects from the WPM are compared to the sample from the Genbank system that is consistent with a true silex juvencus, the similarity is only 90%. *See id.*

prevalent . . . throughout the United States." Andritz has presented evidence that it suggested to CBP and USDA agents Hall's plan to fumigate the WPM in the ship's hold, but CBP and the USDA have not accepted that plan. There is evidence in the record that, in the opinion of the USDA officials, Andritz's plan was not feasible and adequate to prevent the dissemination of the siricidae in and from the WPM.[12] Among other concerns, the USDA officials questioned the effectiveness of the fumigant to kill the siricidae remaining inside the inaccessible portions of the WPM. The crates are tightly packed within the vessel's hold, and the tops of the crates are covered with water impermeable plastic sheeting that may retard flow of the fumigant to all of the infested WPM. Plaintiff's witnesses acknowledged this problem and failed to present adequate solutions.

There is evidence in the record that the USDA officials considered other potential alternatives to re-exportation of the Cargo. Dr. John Daniels,[13] the Department of Agriculture Officer in Charge of Plant Protection and Quarantine in Houston, testified that consideration of alternatives had been ongoing throughout the

---

[12]    The WPM in which Andritz's Cargo was packaged was stamped that it had been subjected to "heat treatment" to eliminate pests in the wood. It is clear that the "heat treatment" on which Andritz or its agent relied was not adequate. The Secretary would not be acting in an arbitrary and capricious manner if he, therefore, viewed Andritz's proposed plan with some skepticism.

[13]    Dr. Daniels holds a Ph.D. in Plant Pathology.

EAN process. He described certain variables that led him to reject certain alternatives in this case that may have worked under different circumstances. For example, the fact that the siricidae in this case had infested the WPM was cause for more concern than a situation where a winged insect merely lights on WPM, which Daniels referred to as a "hitchhiker." The Houston weather at the time, particularly the heat, pocket thunderstorms, and winds, also caused some potential alternatives to be rejected. The presence of pine trees near the Port of Houston was also a factor leading Daniels to insist that any less drastic action be truly effective in preventing the release of the siricidae into the environment. Dr. Nearns testified clearly and persuasively that the escape of just one male and one female could quickly result in hundreds of siricidae infesting the pine trees near the Port of Houston. Daniels testified that he discussed various alternatives with many different people, some who had worked with the USDA for over thirty years. He testified that before issuing the Re-Exportation Order, he and other Government employees considered dockside fumigation using methyl bromide, a highly toxic gas, but it was not feasible because of the very large number of crates and their location throughout the Manchester Terminal. Daniels testified that he was concerned that removing the Cargo from the hold would expose the environment to the infestation.

Daniels testified that they considered fumigation of the Cargo in the hold of the ship, but that this potential alternative would involve a new and untested process not covered by the USDA manual. There was no guidance regarding the amount of chemical to use and, importantly, how safe the process would be for crew members on the ship. There were also feasibility and effectiveness issues regarding any fumigation of the Cargo in the hold. It also was unclear how to access the Cargo to develop the details of the treatment plan without releasing flying siricidae from the hold. Daniels, in sum explained, that after considering less drastic means of dealing with the infestation, in his opinion as the USDA official on site, none was both feasible and adequate to prevent a serious risk of siricidae infestation of pine trees in the neighborhood and beyond.

The Court cannot conclude that it was unreasonable for the Secretary to believe there were, and are currently, live siricidae flying in the vessel's sealed hold where the Cargo is quarantined. Daniels testified that the presence of bore holes indicated that some siricidae larvae in the WPM had matured into active flying insects that left the WPM. It was also rational for the Secretary to believe, when the EANs and Re-Exportation Order were issued, that the siricidae in the WPM were species not native to the United States or were not native to the southern regions, including Texas, of the United States. Therefore, the Secretary's opinion that the siricidae in the WPM

presented a substantial risk to the pine trees close to the Port of Houston, surrounding areas, and beyond was rational. Indeed, the belief has been confirmed by the recent molecular analysis of the siricidae found in the WPM. The Secretary is not required to expend time and resources to conduct detailed analysis of each conceivable alternative to re-exportation when confronted with an immediate risk of pest infestation. *See, e.g., Intercitrus*, 2002 WL 1870467 at *6.

"In these circumstances, the Secretary was not required to gamble with the vitality" of the United States pine forests. *See id.* His decision to issue the EANs and the Re-Exportation Order was not arbitrary and capricious. Therefore, Andritz has failed to demonstrate a likelihood of success on the merits of its challenge to the USDA's decisions.

### B. <u>Existence of Irreparable Harm</u>

The second factor in the preliminary injunction analysis is whether the "movant will suffer irreparable harm" if the injunction is denied. *See Garcia v. United States*, 680 F.2d 29, 31 (5th Cir. 1982); *see also Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008) (identifying second element as a "substantial threat that plaintiffs will suffer irreparable harm if the injunction is not granted"). An injury is irreparable only if it cannot be remedied by an award of monetary relief. *See Burgess v. Fed. Deposit Ins. Corp.*, 871 F.3d 297, 304 (5th Cir. 2017).

Andritz presented evidence that it will suffer financial harm if the Cargo is re-exported. A preliminary injunction is not appropriate where the potential harm to the movant is strictly financial, unless the potential economic loss is so great as to threaten the existence of the movant's business. *See Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1179 (5th Cir. 1989). In this case, Guido Andree Burgel, President of Andritz, testified that he believes Andritz will incur monetary damages to Nucor of $6 million, and liquidated damages to Nucor of $6.5 million. Burgel testified that the Cargo's value is $38 million. There is no evidence that re-exportation of the Cargo will deprive Andritz of the transaction's full value, and the potential damages to Nucor are speculative. Indeed, Nucor's representative at the hearing, Keith Williams, testified fully and never mentioned any intention of Nucor to sue Andritz or otherwise seek to recover $12.5 million in damages from it. Additionally, Burgel testified that he believes the company that packaged the Cargo in pest-infested WPM is responsible for any delay and additional expense caused by re-exportation. Although Burgel testified that the Andritz Board of Directors has discussed the possibility of bankruptcy, he conceded that bankruptcy is only a possibility and is not a definite outcome if the injunction is denied. Burgel's testimony fails to demonstrate financial harm that would threaten Andritz's existence and, therefore, fails to establish irreparable harm.

Andritz argues also that it will suffer irreparable harm due to injury to its reputation. Burgel mentioned during his hearing testimony that he believes failure to deliver the Nucor shipment on time will damage its reputation worldwide. "[A] preliminary injunction will not be issued simply to prevent the possibility of some remote future injury. A presently existing actual threat must be shown." *United States v. Emerson*, 270 F.3d 203, 262 (5th Cir. 2001); *Ocusoft, Inc. v. Walgreen Co.*, 2017 WL 1838106, *4 (S.D. Tex. May 8, 2017) (Miller, J.). Burgel failed to identify the basis for his belief regarding reputational injury resulting from re-exportation of the Cargo, and it is equally likely that any injury to Andritz's reputation would be caused by its having shipped cargo into the United States in WPM infested with siricidae. Andritz's assertion of reputational injury from re-exportation is unpersuasive.

For purposes of irreparable injury, Andritz focuses heavily on damage to Nucor from the four to six month delay in receiving the steel mills components in the shipments in question. The Court appreciates the potential, albeit speculative, financial loss and diminution of market share that Nucor claims it may suffer as a result of the Re-Exportation Order. A movant's burden to obtain the extraordinary relief of a preliminary injunction is to show there is a likelihood that the movant will suffer irreparable harm. *See, e.g., Nichols*, 532 F.3d at 372 (substantial threat that

*plaintiffs* will suffer irreparable harm); *Garcia*, 680 F.2d at 31 (issue is whether the *movant* will suffer irreparable harm). Therefore, the Court declines to issue a preliminary injunction against the United States based on potential harm to a non-party.

###   C.   Balance of Hardships

The third factor is whether the irreparable injury to Andritz caused by the EANs and the Re-Exportation Order outweighs the threatened harm to United States if the injunction is granted. *See City of El Cenizo v. Tex.*, 890 F.3d 164, 176 (5th Cir. 2018); *Camacho v. Texas Workforce Comm'n*, 326 F. Supp. 2d 794, 802 (W.D. Tex. 2004). In deciding whether Andritz has shown that this balance of hardships weighs in its favor, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (internal quotations and citation omitted).

As discussed in the preceding section, Andritz has failed to show that it is likely to suffer irreparable harm if its request for a preliminary injunction vacating the EANs and the Re-Exportation Order is denied. As explained more fully in the following section, the Government's interest in protecting the pine forests in this area, both for commercial and for environmental reasons, is great and heavily outweighs any

financial harm Andritz may suffer. Consequently, Andritz has not shown that the balance of hardships weighs in its favor.

### D. **Public Interest**

The final factor Andritz must prove to obtain a preliminary injunction is that the public interest will be served by the requested injunction. Indeed, in exercising its discretion whether to grant injunctive relief, the Court should give particular regard to the public consequences of "employing the extraordinary remedy of injunction." *See Winter*, 555 U.S. at 24.

Andritz argues that the public interest favors the production of strong, light weight steel for the automotive and other industries. The evidence presented at the preliminary injunction hearing, primarily by Nucor's representative, however, established that the real concern was that Nucor may lose a competitive advantage in the United States steel market.

To the extent Andritz argues a public interest in stronger, light weight steel for the automotive industry, it is uncontested that three foreign steel companies currently manufacture the strong, light weight steel Nucor plans to produce. More importantly for the public interest in a strong domestic steel industry, Williams testified that Nucor believes other companies in the United States are likely to develop a method to produce the strong, light weight steel, although he understands that their ability to do

so is not currently as advanced as Nucor's. Therefore, Andritz has failed to demonstrate that this identified public interest will be served by an injunction precluding CBP from enforcing the Re-Exportation Order.

Andritz also presented evidence that 240 jobs in the United States could be lost if the injunction is not issued and Andritz goes out of business. As discussed above, the possibility of Andritz's bankruptcy is speculative.

CBP, in making its decision to issue the EANs and the Re-Exportation Order in this case after consultation with the USDA, considered information regarding the threat of the siricidae to the pine forests. *See* Links to Manuals, Policy Documents, and Guidance, AR-095 [Doc. # 22], *passim*. The siricidae "feeds on healthy pine trees and serves as a vector for a fungus that kills pine trees." *See id.*, www.invasivespeciesinfo.com. According to a USDA publication regarding siricidae, pine ecosystems provide both economic and environmental benefits that are threatened by siricidae. For example, softwood production in the United States is a multibillion dollar industry. Pine forests also provide "valuable and unique habitat to a variety of flora and fauna throughout the United States." *See id.,* linking to "USDA Proposed Program for the Control of the Woodwasp Sirex Noctilio F. (Hymenoptera: Siricidae) in the Northeastern United States," p. 16.[14]  Because of the "high

---

[14]     As discussed above, certain species of siricidae have already infested pine forests in the northeastern United States, specifically, Pennsylvania and New York.

biodiversity and rare occurrence" of pine habitats, many of the species in the habitats are rare and, in some cases, threatened or endangered. *See id.* The siricidae presents a high risk to North American pine forests. *See id.* at 17.

The threat of the siricidae to the pine trees near the Port of Houston and in the surrounding areas is significant. The consequences of siricidae infestation, both economically and environmentally, are very high and irreversible or extremely difficult to combat.

Having considered the full record, the Court finds that the public interest would be disserved by a preliminary injunction.

### E.   **Conclusion Regarding Preliminary Injunction Factors**

Andritz has not demonstrated a likelihood of success on the merits of its challenge to the issuance of the EANs and the Re-Exportation Order. Andritz has failed also to show that it will suffer irreparable harm if its request for injunctive relief is denied, and to show that the balance of hardships weighs in its favor. The public interest favors protecting the pine forests in Houston and the surrounding area. As a result, Andritz has failed to satisfy the requirements for issuance of a preliminary injunction.

## IV.   **CONCLUSION AND ORDER**

Andritz has failed to satisfy its burden to demonstrate that CBP's decision to require re-exportation of the Cargo and the infested WPM in which the Cargo is

packaged was arbitrary and capricious. Additionally, Andritz has failed to satisfy the requirements for a preliminary injunction. As a result, it is hereby

**ORDERED** that the Application for Temporary Injunction [Doc. # 1] and the Motion to Modify Court's Status Quo Order [Doc. # 9] are **DENIED**. It is further

**ORDERED** that prior orders of this Court requiring that the *status quo* be maintained are **VACATED**. It is further

**ORDERED** that counsel shall appear before the Court on **July 16, 2018**, at **10:00 a.m.** for a status and scheduling conference.

SIGNED at Houston, Texas, this **2nd** day of **July, 2018.**

NANCY F. ATLAS
SENIOR UNITED STATES DISTRICT JUDGE